## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MATTHEW TRIPLETT,**

        **Plaintiff,**

                                    **Civil action No. 3:13cv135**
**v.**                                        **(Judge Groh)**

**JAMES RUBENSTEIN, Commissioner**
**of Department of Corrections for West**
**Virginia [sic];[1] PATRICK MIRANDY, Warden,**
**St. Marys Correctional Center; and**
**JOHN ANDERSON, Associate Warden**
**of Security, St. Marys Correctional Center,**

        **Defendants.**

## REPORT AND RECOMMENDATION

## I. Procedural History

On September 25, 2013, in the Southern District of West Virginia, the then-*pro se* plaintiff,

an inmate incarcerated at the St. Marys Correctional Center ("SMCC") in St. Marys, West Virginia,

filed this civil rights complaint (Dkt.# 3) pursuant to 42 U.S.C. §1983. Plaintiff's complaint raises

failure to protect and loss of personal property claims, and requests an emergency hearing.

By Order entered September 26, 2013, the case was transferred to this district. The Clerk of

Court issued a deficiency notice, directing plaintiff to file his complaint on a court-approved form,

and either file an application to proceed *in forma pauperis*, along with a signed Consent to Collect

Fees from Trust Account and a copy of his Prisoner Trust Account Report ("PTAR") with its

attached Ledger Sheets, or pay the filing fee.

By Order entered October 1, 2013, the Warden was directed to respond within seven days to

plaintiff's    allegations    of    imminent    harm    regarding    being    housed    again    with

---

[1] The correct name of the "Department of Corrections for West Virginia" is West Virginia Division of Corrections.

a "keepaway," an inmate who had previously attacked him.[2]  The Warden filed his response on October 8, 2013.  (Dkt.# 14).  On October 10, 2013, the plaintiff filed his court-approved form (Dkt.# 18); a Notice of Intent. (Dkt.# 19); and the court-approved documents necessary to apply to proceed as a pauper. (Dkt.# 20, 21, and 22).  By Order entered October 15, 2013, plaintiff was granted permission to proceed *in forma pauperis* ("IFP"). (Dkt.# 23).  On October 21, 2013, the plaintiff filed a response to the Warden's response (Dkt.# 25), and  Motion to Compel. (Dkt.# 26). By Order entered October 22, 2013, the Motion to Compel was denied without prejudice as premature. (Dkt.# 27).  On October 24, 2013, the Warden filed a supplemental response. (Dkt.# 28).  The plaintiff filed a response to the Warden's supplementary response on November 4, 2013. (Dkt.# 30).  The plaintiff paid his initial partial filing fee on November 7, 2013.

By Order entered November 12, 2013, the defendants were directed to answer the complaint. (Dkt.# 32). On November 18, 2013, the plaintiff filed a Supplement to Response. (Dkt.# 35) and an Affidavit/Motion for Appointment of Counsel.  (Dkt.# 36).  By Order entered November 19, 2013, the plaintiff was directed to produce copies of his administrative remedies. (Dkt.# 37).  By separate Order entered the same day, plaintiff's motion for appointed counsel was denied. (Dkt.# 38).  On December 6, 2013, plaintiff's counsel entered their notice of appearance (Dkt.# 41), along with a Response to the Order Directing Plaintiff to Produce Copies of Administrative Remedies. (Dkt.# 42). On June 9, 2014, the defendants filed a Supplemental Motion to Dismiss. (Dkt.# 43).

This case is before the undersigned pursuant to LR PL 2, for a report and recommendation.

## II. Contentions of the Parties

### A. Plaintiff's Complaint (Dkt.# 3 and 18)[3]

---

[2] An amended Order was entered on October 3, 2013, for the sole purpose of correcting a typographical error referencing the Warden's address in the last paragraph on the second page on the original Order. (Dkt.# 12).

[3] The plaintiff's pleadings, some of which are hand-written and some typed, are nearly illegible and very disorganized. The undersigned has made every attempt to try to set forth the facts as stated.

In the complaint filed on September 25, 2013, and the court-approved form complaint, filed on October 10, 2013, the plaintiff raises failure to protect and loss of personal property claims against the defendants, contending that:

1) on August 29, 2011, at around 5:00 p.m., in a bathroom on pod 76-1 at SMCC, he was punched in the right eye by inmate D.R.,[4] who wanted plaintiff to hand over his prescription medications. Plaintiff contends that when he was punched, he "hit the floor" and went into a "panamal seizure."[5] He was "rescued by" a counselor, Ms. Kelly Brown, and an inmate advised the officer that D.R. had assaulted plaintiff.[6] Plaintiff was rushed by gurney to the infirmary, where he was admitted and kept overnight. He avers that Vickie Gheen RN/HSA advised him later that he was given "two direct IV sticks of 2 mg. Ativan to stop the . . . seizure." When he awoke and asked what happened, plaintiff explained what D.R. had done to him.[7]

2) On August 30, 2011, plaintiff advised Vickie Gheen RN that inmate D.R. was the one who struck him and caused his black, swollen eye. No pictures were taken of plaintiff's injuries at that time,[8] but inmate D.R.'s hands were photographed, and D.R. denied striking plaintiff.[9]

3) On October 14, 2011, D.R., the same inmate who had previously assaulted plaintiff, along with another inmate, W.D, both of whom plaintiff contends were hired by Vickie Gheen RN to work in the SMCC infirmary, observed the nurse apply a Fentanyl narcotic patch to plaintiff's back.[10] Plaintiff alleges that thereafter, D.R. "flipped" him over onto his stomach; inmate W.D. held a razor to his throat and ordered him to remain quiet while D.R. removed the Fentanyl patch from his back. Plaintiff states he lay still and complied.[11]

4) At some unspecified date and time, but possibly on October 14, 2011, at some point after the Fentanyl patch was forcibly removed from his back, plaintiff contends he was attacked in the rest room by four inmates, J.C.1, J.C.2, R.S., and A.A. He avers that these inmates choked him to keep him for calling for help, and then "forced him to engage in oral sex, and removed plastic wrap off a sandwich."[12]

---

[4] The inmates involved in the physical and sexual attacks on the plaintiff are identified herein by only their initials.

[5] The undersigned assumes that the plaintiff is attempting to say that he had a grand mal convulsion. Medical records plaintiff produced in a prior civil action suggest that plaintiff has multiple chronic medical issues, and among other things, takes two regularly-prescribed anti-seizure medications. See 2:13cv13 Dkt.# 1-1 at 5, 8, 9).

[6] Dkt.# 18 at 8.

[7] Dkt.# 18 at 9.

[8] Dkt.# 3 at 6.

[9] Dkt.# 18 at 9.

[10] Dkt.# 18 at 8 - 9.

[11] Dkt.# 3 at 5; Dkt.# 18 at 8 – 9.

[12] It is unclear what the reference to plastic wrap means. Dkt.# 18 at 9.

5) Plaintiff alleges that on December 7, 2011 and/or December 10, 2011, he warned "Officer Ray" that he was being threatened by four inmates on Pod 75-7; that those prisoners were assaulting him and would assault him further if he did not follow their "direct orders" to spit his evening medicines, received at the medication line, into his coffee cup to give to them.[13]

6) Plaintiff alleges that on or about December 8, 2011, he notified the SMCC medical administrator that he was in fear of six inmates who were attacking him in order to coerce him into giving them his medications.[14]

7) On or about December 8 or 10, 2011,[15] in plaintiff's room in SMCC segregation pod 75-7, plaintiff was beaten and anally raped by a group of 4-6 inmates.[16] The pod officer called for assistance. Officer Vandmeter arrived to find plaintiff "bloody, batterd [sic] and mentally shaken." Defendant Captain John Anderson was called; he met with plaintiff and Officer Vandmeter in a holding area, determined that a sexual assault had taken place, and notified the State Police. Plaintiff was sent for a medical exam and received care from Sharon Glasscott LPN. Plaintiff states he had "a [sic] open wound to . . . head, hands, nose and eyes," and the LPN cleaned up "all blood and dirt off of plaintiff's whole body."[17] The State Police interviewed plaintiff; took photos of his injuries; and told plaintiff that charges would be filed.[18] Amanda Anderson, the SMCC Movement Coordinator, met with plaintiff and advised that arrangements had been made for plaintiff's immediate transfer to Northern Correctional Facility ("NCF").[19]

8) During the four hours between the physical/sexual assault at SMCC and the time his things were packed up by SMCC staff, in preparation for his transfer to the NCF, while plaintiff was out of his room receiving treatment for his injuries, some of his belongings disappeared or were deliberately destroyed. Plaintiff avers that there was evidence left behind to indicate that it was inmate R.S.[20] who did it.[21]

9) Upon arrival at NCF, plaintiff avers he was screened and evaluated by Cecelia Janiszewski and Robin Janiszewski RN. Afterwards, a Sgt. Powell assured him that he would be well taken care

---

[13] Dkt.# 3 at 5; Dkt.# 18 at 8.

[14] Dkt.# 18 at 7.

[15] It appears from a contemporaneously-created grievance that the actual date of the rape was December 8, 2011. See Dkt.# 42-1 at 2.

[16] Dkt.# 3 at 6. An apparently contemporaneously-created grievance filed indicates that there were six inmates involved, the two who participated in the October 14, 2011 removal of the Fentanyl patch, and the four involved in the subsequent choking/forced oral sex. See Plaintiff's December 11, 2011 Grievance, Dkt.# 42-1 at 2.

[17] Dkt.# 18 at 8.

[18] Dkt.# 3 at 7.

[19] Dkt.# 3 at 7 and Dkt.# 18 at 8.

[20] Plaintiff avers that R.S. held him down during the December 2011 attack, while the other inmates anally raped him.

[21] Dkt.# 18 at 10 and 14.

of there, and advised him not to discuss what had happened to him at SMCC with any other inmates.[22] He was taken to the C-2 pod, and then met with his case manager in his office "with the door shut," given a 10-minute phone call to his mother to advise her about the assault, and a sexual assault victim packet.[23] The plaintiff asserts that his case manager told him to provide the names of the inmates who attacked him, so that they could be placed in the computer, to ensure that they would never be housed in any facility with plaintiff again.[24]

10) On December 13, 2011, plaintiff was seen by Timothy L. Thistlewaite, MD, who documented on a video screen what plaintiff's mental health status and diagnoses were.[25] Plaintiff asserts that he sees Dr. Thistlewaite every 90 days, for management of his medications.[26]

11) Plaintiff asserts that on December 22, 2011, at 3:30 pm, he received treatment for his anal area from Courtney Hypes, LPN and Phillip E. Shoaf, D.O.[27]

12) Plaintiff avers that beginning on January 4, 2012, at 4:50 pm, he began having weekly therapy with Dr. Horachek for his "mental state over the sexual assault."[28]

13) Plaintiff avers that on an unspecified date, he was "sent to Ruby Memorial Hospital Susan Adkins LPN on shift [sic]. Plaintiff was sent for any sexually transmitted dieseases [sic] kit tests confirmed noted and bowl[29] [sic] ultrasound diagnoses noted."[30]

14) Plaintiff assert that on June 24, 2012, Courtney Hypes, LPN, first observed that he had open, reddened, raised, areas between his buttocks near his rectal area that continue to drain and bleed. Plaintiff asserts that the area is very tender and painful, and has required medical treatment, including a 5-month stay in the infirmary.[31]

14) After being transferred away from SMCC after the December, 2011 assault, plaintiff was subsequently sent to several different WVDOC facilities, and "at some point sent right back to SMCC." At an unspecified date "between 25th – 29th" one of the inmates who held him down during the December, 2013 gang rape arrived back at SMCC from Stevens Correctional Center.[32] Plaintiff

---

[22] Dkt.# 3 at 7; Dkt.# 18 at 14.

[23] Dkt.# at 8.

[24] Dkt.# 3 at 8.

[25] Dkt.# 18 at 14.

[26] Dkt.# 3 at 10; Dkt.# 18 at 13.

[27] Dkt.# 3 at 8.

[28] Dkt.# 3 at 8.

[29] The undersigned presumes plaintiff is referring to a "bowel" ultrasound, not "bowl" ultrasound.

[30] Dkt.# 3 at 8.

[31] Dkt.# 3 at 8 – 9.

[32] Dkt.# 18 at 12.

avers that he is currently being housed with, and is in fear of, this inmate. Further, he contends that he attempted repeatedly to speak with defendants Anderson and Mirandy about the issue, but that both "just blow plaintiff off" and fail to respond or address his concerns.[33]  He states he has filed a grievance over the issue.[34]

Plaintiff contends that because of the assaults, he has sustained physical and mental damage from the blow to the head; anal tearing, with bleeding and continued discomfort;[35] suffers "fear and parinoia [sic]," and nightmares that cause him to wet the bed.[36] He has received psychological therapy for his "physical . . . and mental scars" from the assault and was advised by Dr. Thistlewaite that he recommended intensive therapy throughout his incarceration and afterward, because those scars could "last a lifetime."  Plaintiff contends that he filed Level One, Two and Three remedies with the office of the Warden at SMCC.  He contends he filed the first one on the day of the assault; although unclear, it appears he is alleging that his remedies were not forwarded to him at the NCF where he was transferred to, "hours after assult [sic]."  He states he asked his counselor at the NCF to contact SMCC.  Plaintiff also contends he wrote a letter to the Warden[37] but received no response.[38]

As relief, plaintiff requests that the court grant him an "emergency hearing. So the court will hear and get all documentation of facts needed;" medical treatment for his anal area; intensive counseling; release from WVDOC for the remaining 11-month balance of his sentence; and Five Million Dollars in damages for "future needs."

## B. Warden's Mirandy's Response to Plaintiff's Allegations of Imminent Danger (Dkt.# 14)

Warden Patrick Mirandy contends that the complaint should be dismissed, because

---

[33] Dkt.# 3 at 10; Dkt.# 18 at 15.

[34] Dkt.# 18 at 15.  See also Dkt.# 42-1 at 13.

[35] Dkt.# 18 at 16.

[36] Dkt.# 18 at 15.

[37] It is unclear whether plaintiff means the Warden of the NCF, or the Warden of SMCC, defendant Pat Mirandy.

[38] See Dkt.# 3 at 3.

1) plaintiff's SMCC file contains nothing to confirm he was a victim of sexual assault on December 10, 2011 or at any other time while housed at SMCC;

2) plaintiff has not identified the inmate he alleges he is afraid of;

3) of the inmates that plaintiff does identify in his complaint, none are currently housed at SMCC;

4) both before and after plaintiff filed his complaint, despite having ample opportunity to do so, plaintiff has never expressed any concerns to Warden Mirandy regarding the allegations in the complaint;

5) as a result of the allegations in the complaint, an October 4, 2013 Special Management hearing was held; at that hearing, plaintiff did not mention any imminent danger and clearly indicated he was satisfied with his current housing arrangements at SMCC; and

6) both before and after he filed his complaint, despite having ample opportunity to do so, plaintiff has never expressed any concerns to Associate Warden Anderson regarding the allegations in the complaint.

7) Associate Warden Anderson met with plaintiff on October 7, 2013, and again, plaintiff did not mention any imminent danger and clearly indicated he was satisfied with his current housing arrangements at SMCC.

## C. **Plaintiff's Response to Warden's Response (Dkt.# 25)**

Plaintiff denies that anyone interviewed him on October 4, 2013, insists that he is not content with his current living arrangement and reiterates his claim that he is in imminent danger from the inmate R.S., who he identified by name. He asserts that he attempted to discuss the issue with defendant Anderson on October 1, 2013; Anderson told him he would call him to his office to discuss it later; but that Anderson never did. He avers that R.S., the inmate he is afraid of, arrived back at SMCC on or about August 28, 2013. He further avers that on or about October 15, 2013, at 11:30 a.m., he spoke with Warden Mirandy in the presence of a witness, and informed Mirandy that R.S. was housed in SMCC's hospital, and that Mirandy said "yes that [sic] he Knew [sic] this." Plaintiff further asserts that medical records will confirm that R.S. is housed at SMCC, and the Pleasants County West Virginia State Police investigated the gang rape and should have records confirming it.

## D. **Warden Mirandy's Supplemental Response (Dkt.# 28)**

Mirandy reiterates his claim that he met with plaintiff on October 4, 2013 and again on October 22, 2013, and insists that despite plaintiff's assertions to the contrary, during the October 22, 2013 meeting, plaintiff confirmed that they had in fact, met on October 4, 2013 and that that he was satisfied with his current living arrangement. Finally, Mirandy asserts that R.S., the inmate plaintiff is afraid of, is currently an inpatient at an outside hospital, but that if he returns to SMCC at any point in the future, SMCC staff will "assess plaintiff's housing situation and utilize the correctional center's policies to maximize plaintiff's safety."[39]

**E. Plaintiff's Response to Warden's Supplemental Response (Dkt.# 30)**

Plaintiff denies ever confirming to defendant Mirandy that the two of them met on October 4, 2013; he asserts that the first time they ever met was October 22, 2013, and at that time, he advised Mirandy that he did not know whether, if R.S. was brought back, he would be in imminent danger or not, and that Mirandy could not give him a guarantee that he would not be in imminent danger.

**F. Plaintiff's Supplement to Response (Dkt.# 35)**

Plaintiff again denies Warden Mirandy's contention that plaintiff never communicated any fear or imminent risk of harm regarding his housing assignment to him, either in person or in writing. He attaches a copy of an August 27, 2013 Interview Request to Warden Patrick Miranndy, requesting to speak to him about an "emergency issue" regarding someone at SMCC who was not supposed to be there, and referencing the attack in December, 2011. He also attaches a copy of an administrative remedy, originally dated September 25, 2013,[40] wherein he raised the issue again.

**G. Motion for Appointed Counsel**

In plaintiff's motion, he expounds in graphic detail regarding events leading up to the December 2011 gang rape; the rape itself; his injuries; and his subsequent treatment.

**H. Plaintiff's Response to Order Directing Plaintiff to Produce Copies of Administrative**

---

[39] Dkt.# 28-1.
[40] The original date was crossed out and replaced with the date "10/1/13." Plaintiff wrote a comment in the margin, questioning the change. Dkt.# 35-3 at 2.

**Remedies (Dkt.# 42)**

Plaintiff, now through counsel, attaches copies of Interview Requests and administrative remedies he filed, and contends that pursuant to W.Va. Code §25-1A-2(a), exhaustion of administrative remedies is not required where claims of violence, sexual abuse or sexual assault against an inmate are at issue.

**G. Defendants' Supplemental Motion to Dismiss (Dkt.# 43)**

Defendants reiterate the claim, first asserted by Warden Mirandy, that the complaint should be dismissed. In support, they contend that:

1) any claim against SMCC should be dismissed as a matter of law;

2) any claims against defendant Rubenstein ("Rubenstein"), Mirandy or Anderson should be dismissed as a matter of law;

3) there is no *respondeat superior* in §1983;

4) the defendants are entitled to qualified immunity; and

5) defendants reserve any and all defenses in connection with plaintiff's failure to exhaust his administrative remedies.

## III. Standard of Review

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . .

. claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>Id</u>. (citations omitted), to one that is "plausible on its face," <u>Id</u>. at 570, rather than merely "conceivable." <u>Id</u>. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co</u>., 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp</u>., 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (<u>Id</u>).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B. <u>Summary Judgment</u>**

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. liberty lobby, Inc.</u>, 477 U.S. 242, 248 *1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. V. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id</u>. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. <u>Anderson</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u> at 587 (citation omitted).

## IV. <u>Analysis</u>

### A. <u>St. Marys Correctional Center</u>

The defendants contend that any claim by plaintiff against SMCC should be dismissed as a matter of law, because SMCC is not a person amenable to suit under §1983. The undersigned agrees that SMCC is not a "person" under § 1983. See Roach v. Burch, 825 F. Supp. 116 (N.D.W.Va. 1993); see also Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C.1989); Will v. Michigan Dept. Of State Police, 491 U.S. 58, 71 (1989)(neither a State nor its officials acting in their official capacities are persons under §1983); Preval v. Reno, 203 F.3d 821 (4th Cir. 2000) (unpublished) (the Piedmont Regional Jail is not a person under § 1983). However, here, nowhere has plaintiff alleged that he is suing SMCC.

**B. Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[41] and is required even when the relief sought is not available. Booth supra at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. See Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added). Moreover, an inmate may procedurally default his claims by failing to follow the proper procedures. See Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378 (2006) (recognizing the PLRA provisions contain a procedural default component).

Moreover, in Woodford v. Ngo, 126 S.Ct. 2378, 2382 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a

---

[41] Id.

federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits."  Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion."  <u>Woodford</u>, 126 S.Ct. at 2387 (emphasis added).  Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system.  <u>Id.</u> at 2393.

In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint.  However, that decision does not abrogate the fact that an action under 42 U.S.C. § 1983 is subject to exhaustion of administrative remedies as required by the PLRA.  Nor does it abrogate well-established Fourth Circuit precedent which allows the Court to summarily dismiss a complaint in which the failure to exhaust is clearly evident.  <u>Anderson v. XYZ Correctional Health Services</u>, 407 F.3d 674  (4th Cir. 2005).  <u>Jones</u> also held that an inmate does not automatically fail to exhaust when the inmate sues one or more defendants not named in the pertinent grievances. Id., at 923. If a complaint contains claims, some of which have been exhausted and some of which have not been, the entire complaint is not dismissed; the court proceeds only on the exhausted claims. <u>Id</u>., at 924-26.

The West Virginia statute pertaining to the requirement that prisoners exhaust remedies is found at West Virginia Code § 25-1A-2(a), which provides as follows:

> (a) An inmate may not bring a civil action until the administrative remedies promulgated by the facility have been exhausted; *Provided*, That the remedies promulgated by the facility will be deemed completed within sixty days from the date the inmate filed his or her initial complaint if the inmate fully complied with the requirements for filing and appealing the administrative complaint.

The Code also requires the Commissioner of the Division of Corrections and the Executive Direction of the Regional Jail Authority to establish administrative procedures for processing prisoners' complaints about the conditions of their confinement.  W. Va. Code § 25-1A-2(b).

West Virginia Code § 25-1A-2(c) states:

(c) Notwithstanding any other provision of this code, ***no inmate shall be prevented from . . . bringing a civil or criminal action alleging past, current or imminent physical or sexual abuse***; if such a civil or criminal action is ultimately dismissed by a judge as frivolous, then the inmate shall pay the filing costs associated with the civil or criminal action as provided for in this article.

W.Va. Code § 25-1A-2(c)(emphasis added).

Because plaintiff's complaint alleges physical and sexual attacks by other inmates, despite the fact that he may not have fully exhausted his claims over those incidents, the exhaustion requirement does not apply to his failure to protect claims regarding the physical and sexual assaults. However, as for plaintiff's other claims, complete exhaustion of administrative remedies is required.

The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues. The first level involves filing a G-1 Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . ," see Booth v. Churner, 532 U.S. at 741, n. 6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006

WL 2945967 (S.D. Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

Here, it is apparent from the record that the plaintiff never even initiated the grievance process over his claim for lost or damaged property, thus that claim must be dismissed for failure to exhaust.

**C.  Deliberate Indifference/Failure to Protect**

In order to state an Eighth Amendment claim of failure to protect, the plaintiff must show that prison officials violated their duty to protect him "from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. at n. 3.  However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

A district court should construe *pro se* petitions liberally, no matter how unskillfully pleaded. See Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978).  However, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a claim cognizable in a federal district court.  Weller v. Dept. of Social Services, 901 F.2d 387 (4th Cir. 1990). Further, although Fed. R.

Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996). <u>See</u> <u>also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 764 (4th Cir. 1990).

Here, the plaintiff contends that WVDOC and SMCC employees failed to protect him from violence at the hands of other inmates on multiple occasions: August 29, 2011; October 14, 2011; the later forcible oral sex which occurred on an unspecified date, but possibly also on October 14, 2011; the gang rape that occurred on December 8, 2011; and the subsequent return of inmate R.S., presumably a "keepaway" of plaintiff's, to SMCC in late August, 2013.

## 1) Defendant Rubenstein, Commissioner of West Virginia Division of Corrections

To the extent that plaintiff is suing defendant Rubenstein in his individual capacity, he has failed to state a claim. In order to establish personal liability against a defendant in a § 1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. <u>See</u> <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978); <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977).

The plaintiff does not allege any personal involvement by defendant Rubenstein in his placement in the pod where he was attacked on August 29, 2011; October 14, 2011, or December 8 or 10, 2011, or in the subsequent placement of inmate R.S., one of plaintiff's previous attackers and presumably a "keepaway" of his, at SMCC with him in August, 2013. Instead, his only allegation regarding Rubenstein's involvement is that he "has full responsibility of operations at all West Virginia State Institutions. It is his office that takes charge of these types of, Assults [sic]. And he and his office – failed."[42]

When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if the subordinate acted pursuant to an official policy or custom for which he is

---

[42] Dkt.# 3 at 4.

responsible, <u>see</u> <u>Fisher v. Washington Metropolitan Area Transit Authority</u>, 690 Fed 2nd 1113 (4th Cir. 1982); <u>Orum v. Haynes</u>, 68 F.Supp.2d 726 (N.D. W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries suffered by the plaintiff." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." <u>Id</u>. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" <u>Id</u>.

To the extent that the plaintiff may be asserting that defendant Rubenstein was deliberately indifferent to his safety by denying administrative grievances he filed over the return of inmate R.S. to SMCC and SMCC staff's failure to keep him away from plaintiff, any such claim is without merit, because that is not the type of personal involvement required to state a claim. <u>See</u> <u>Paige v. Kuprec</u>, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

A careful review of the plaintiff's complaint establishes that not only has he failed to assert credible allegations to support a finding that the elements necessary to establish supervisory liability are present against Rubenstein. Accordingly, then, any claim he might have against Rubenstein fails to state a claim upon which relief can be granted.

**2) <u>Defendants Mirandy and Anderson</u>**

The record is ambiguous, contradictory and incomplete regarding plaintiff's allegations of physical and/or sexual assaults by other inmates. While plaintiff makes very specific, detailed and credible allegations, including providing details, names, dates, and times, leading the undersigned to believe that he is referencing medical records or contemporaneously-created notes of some sort, the defendant Mirandy's initial response avers that plaintiff's file "does not contain any documents confirming that he was the victim of a sexual assault on December 10, 2011, or at any other point while he was housed at . . . [SMCC]."[43]  Mirandy and Anderson also aver that despite having had ample opportunity to do so both before and after the filing of his complaint, plaintiff never raised any complaint of fear or described any imminent danger as a result of his housing assignment with any other inmate with either of them.[44] The defendants' subsequent supplemental responses shed little further light on the issue.

In an attempt to corroborate plaintiff's claims, the undersigned has reviewed the copies of administrative remedies produced by plaintiff in this action, along with certain medical records produced by the plaintiff in his earlier case.[45] Unfortunately, those records are limited, and there is a fourteen month + gap in the records, spanning the time period between November 22, 2011 and January 29, 2013.  Therefore, there is no record of plaintiff receiving treatment after a gang rape in December, 2011; referencing plaintiff ever being sexually assaulted; treated for bleeding or open areas on or near his anus or buttocks; or receiving psychological counseling and/or medication to deal with the trauma of rape.  Furthermore, the only Interview Requests plaintiff produced regarding the claims in this complaint are dated August 27, 2013, almost 21 months after the December, 2011

---

[43] See Dkt.# 14 at 1,  and Dkt.# 14-1 at 1.

[44] Dkt.# 14 at 1-2; Dkt.# 14-1 at 1, and Dkt.# 14-3 at 1.

[45] See 2:13cv13.

rape. However, there is one Inmate Request/Grievance, dated December 11, 2011, which indicates that the date of the rape was December 8, 2011, and states

> Im [sic] on the prison's side NCF Im [sic] not at jail. Im [sic] filing a grievaince [sic], pertaining [sic] that these officers are not giving me a DOC grievance [sic] I was sexually and physically assaulted at St. Marys by . . . [R.S., J.C.1, J.C.2, A.A., B.R.,[46] W.D.] I need my grievances I filed there. Please help me [sic]

Dkt.# 42-1 at 2.[47]

However, there are records providing credible support for two of plaintiff's earlier claims. Regarding the August 29, 2011, punch in the right eye by D.R. in the bathroom on Pod 76-1; the grand mal seizure; and treatment in the infirmary, while plaintiff's medical records do not specify that there was a preceding assault, they do indicate that he was brought to the SMCC infirmary that day after suffering what appeared to be a seizure, was treated for the same, and was noted to have a "[b]lue ecchymotic area noted to the R outer orbital area."[48]

However, despite the fact that plaintiff contends that after the attack, he told SMCC infirmary staff and Vicky Gheen RN/HSA that D.R. was the one who hit him, he does not allege that he ever told SMCC staff why he was struck, i.e., that he was at risk because other inmates wanted his medications. Further, it does not appear from the record that he ever filed an initial grievance over the issue. Finally, and most critically, nowhere does plaintiff allege that he ever warned the defendants *prior to* the August 29, 2011 attack that he was at risk from D.R. Thus, he has not shown that Mirandy or Anderson knew of and disregarded an excessive risk to his health or safety. Farmer v. Brennan, *supra* at 837. Nonetheless, even if he could prove otherwise, because plaintiff waited

---

[46] This inmate, although alleged to be the same one who attacked him on August 29, 2011, is referred to by a different first name than previously.

[47] There is nothing written on the bottom half, reserved for the WVDOC staff's "response/disposition."

[48] See 2:13cv13, Dkt.# 1-1 at 5.

over two years to file suit over this assault, the two-year statute of limitations has run on the claim and it must be dismissed.

Next, plaintiff contends that on October 14, 2011, D.R.[49] and W.D, two inmates hired by Vickie Gheen RN/HSA to work in the SMCC infirmary, after seeing a nurse apply a Fentanyl narcotic patch to plaintiff's back, got him alone later, held him down, and at razorpoint, forcibly removed the Fentanyl patch from his back.

A review of the records plaintiff produced in his prior case reveals that he did indeed receive a Fentanyl patch on this date, presumably for a painful muscle spasm, along with some Tums tablets to chew "till spasm relieved."[50] However, those medical records also reveal that this incident did not occur at SMCC; rather, it occurred at the Mt. Olive Correctional Center ("MOCC").[51] Accordingly, neither defendant Mirandy or Anderson could have any responsibility for this assault; thus, this claim against them must be dismissed.

Plaintiff described his treatment at the hands of the inmates who assaulted him in painfully graphic detail in his November 18, 2013 motion for appointed counsel, asserting that he

> went threw some very serious phsyical [sic] assult [sic] and was forced down by strenth [sic] by another inmate and the ohter [sic] inmates had sanwitch [sic] wrap and I was choked outmy [sic] under wear [sic] was full of blood they kept sexually asulteding [sic] me by forcing there [sic] penis [sic] inside my body I have mental scars imotional [sic] at night I scream out loud. The other inmates in my room run out of there some times. I do have difficulty using the bathroom the constant torture in 75-7 was something that know [sic] inmate should ever have to go threw [sic] and even givin [sic] the officer a heads up and he makes the decision to clock out and look away. still [sic] to this day Im [sic] being told what . . . [R.S., J.C.1, J.C.2, and A.A.] were jaming [sic] three fingers inside my anus im [sic] currently having mental break downs that I have to see A pshycologogist [sic] every two weeks. and see the dr. every 90 days to renew meds that I have to take after this assult [sic] took [sic]

---

[49] D.R. is the same inmate who plaintiff alleges previously punched him in the right eye on August 29, 2011.

[50] The record in plaintiff's previous case indicates that he suffers from, among other things, intestinal lympangiectasia, a condition which causes malabsorption of fat and fat-soluble vitamins, and sometimes, osteomalacia associated with vitamin D deficiency; tetany attributed to hypocalcemia has also been reported in the literature. See http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3046182/

[51] See 2:13cv13, Dkt.# 1-1 at 7.

place please judge and find someone that will help me i have alot [sic] more im [sic] afraid to discuss on paper do [sic] to staff its unreal please help me god blees [sic] I hope to tell you every thing things staff made me say and do Ihave [sic] seveare [sic] troulble [sic] with my bowls [sic] constant bleeding. I have all medical documentation I I [sic] filed grievances when the day before [sic] over dry humping me [sic] forcing me to put my mouth insidethere [sic] penis they even used a stinger it was a iron [sic] electric taking the cord plging [sic] it in and burning me they used it to heart [sic] there [sic] coffee they would smuggle in . . . please helping [sic] me get counsel [sic] I still Wake up In the Middle Of [sic] the night and remove jolly ranchers from my armpits and toiletpaperon [sic] top [sic] opme [sic] sharpie marker [sic] wrote rat all over my face thank [sic] that this jundg [sic] will appoint me counsel cause if you catcth [sic] them in a lie they will go as far to desroy [sic] any documentation I thatwould [sic] further prosecute them [sic] warden had my folder walking around with it and could it be possible [sic] to cover up a assult? [sic].

Dkt.# 36.

Plaintiff's next claim is that on some unspecified date after the Fentanyl patch was forcibly taken from him by D.R. and W.D., he was attacked in the rest room by inmates, J.C.1, J.C.2, R.S., and A.A., who choked him to keep him from calling for help, and then forced him to perform oral sex on one, more or all of them.[52] Plaintiff also makes an unclear claim regarding plastic wrap from a sandwich being involved.

Despite a thorough, repeated, exhaustive review of the plaintiff's almost incoherent pleadings, it is impossible to determine with certainty from the record whether plaintiff is alleging that this sexual assault happened on October 14, 2011, the same day the Fentanyl patch was removed, or at a later date. It appears entirely possible that it may have happened the same day, perhaps within hours after the patch was taken from him. If it did indeed happen on October 14, 2011, there is nothing in the record of this or plaintiff's other case to show that the plaintiff contemporaneously reported such an outrageous attack to any SMCC staff member, or sought medical treatment afterwards. Nonetheless, if it did happen on October 14, 2011, then again, neither Mirandy or Anderson could be implicated in failing to protect him, because plaintiff's medical records from the previous case show that he was at MOCC that day, not at SMCC. However, liberally construing

---

[52] Plaintiff does not specify if he was forced to perform oral sex on all or some of them.

plaintiff's claims, to the extent that plaintiff is attempting to allege that this assault occurred on a later date, when he was back at SMCC again,[53] it is unclear whether his post-August 29 and 30, 2011 warnings to SMCC staff and Vicky Gheen RN, HSA in particular, that he was being targeted and threatened, could constitute notice to SMCC staff for future attacks, such that Mirandy or Anderson could have known of and disregarded an excessive risk to his health or safety. Farmer v. Brennan, *supra* at 837. However, the pleadings are unclear, and the defendants' responses are unhelpful.

Plaintiff next contends that on December 7, 2011,[54] or possibly December 10, 2011,[55] he warned one Officer Ray[56] that he was being threatened by four inmates on Pod 75-7 and that those inmates were assaulting him and would continue to attack him if he did not follow their "direct orders" to spit his medications into his coffee cup to give to them. Further, he asserts that on or about December 8, 2011, he notified the SMCC medical administrator that he was in fear of six inmates who were attacking him in order to coerce him into giving them his medications.[57] The plaintiff alleges that on December 8, 2011, in his room in SMCC segregation Pod 75-7, he was beaten and anally raped by a group of 6 inmates.[58] Plaintiff specifically contends that defendant Anderson, a Captain at the time, was called to the scene immediately after the assault, and he met with plaintiff and an Officer Vandmeter in a holding area, determined that a sexual assault had taken place, and notified the State Police. After receiving emergency medical treatment, plaintiff was

---

[53] The defendants have provided the most minimal of responses in this action, so the exact date(s) when plaintiff was incarcerated at the SMCC are unknown.

[54] See Dkt.# 3 at 5.

[55] Dkt.# 18 at 8.

[56] Officer Ray is not a named defendant.

[57] Dkt.# 18 at 7.

[58] Dkt.# 3 at 6; see also Dkt.# 42-1 at 2.

interviewed by the State Police, had his injuries photographed, and was advised that charges would be filed against his attackers.[59]  He was transferred to NCF within hours after the attack.

The allegations regarding the December, 2011 rape, and possibly, upon further discovery, the allegations regarding the sexual attack that occurred on an unknown date after the Fentanyl patch was removed on October 14, 2011, when very liberally construed, with all inferences in plaintiff's favor, state a potentially cognizable claim for failure to protect.  It is inexplicable to the undersigned why plaintiff waited nearly two years to file suit over these brutal attacks.  It appears from the record that plaintiff might never have filed suit over these claims at all, if it had not been for his next claim, which despite the seriousness of the previous claims, appears to be the gravamen of plaintiff's complaint: the subsequent decision by the SMCC staff to fail to keep him away from and protected from the inmate R.S., who plaintiff contends participated in the earlier attacks.

### 3) Failure to Protect from Keepaway, Inmate R.S.

Plaintiff alleges that despite having been told, after his December, 2011 rape, to provide the names of the inmates who attacked him so that those inmates' names could be put into the computer and to keep them away from him in the future, "between 25th – 29th"[60] inmate R.S. was transferred from Stevens Correctional Center to SMCC, where plaintiff was again incarcerated. Plaintiff alleges that R.S. is the inmate "that was the one that was strong enough to hold plaintiff down"[61] during the December, 2011 gang rape.  Frightened of future attacks, plaintiff alleges that he

> . . . waited and verbally spoke to John Anderson while he is [sic] walking by to go to his office [sic] including Patrick, [sic] Mirandy as well  [sic] Plaintiff states hes [sic] in need to speak to you about his health and safty [sic].   On a sertain [sic] inmate that they failed to keep from plaintiff [sic] so he will not be in harm's way butt [sic] they

---

[59] Dkt.# 3 at 7.

[60] Elsewhere, plaintiff avers that R.S. arrived back at SMCC "on or about Aug. 28th. [sic] 2013." Dkt.# 25 at 1. However, it is unlikely that R.S. arrived at SMCC on the 28th, because plaintiff's Interview Requests over the issue are dated August 27, 2013.

[61] Dkt.# 3 at 9; Dkt.# 18 at 12.

keep saying I'll call you down next day. [sic] Mr. Anderson said oh I forgot I'll try getting you down today [sic] never was called to discuss this matter.

Dkt.# 3 at 10.

Unsuccessful in obtaining a personal interview with either Mirandy or Anderson, on August 27, 2013, plaintiff filed Interview Requests to Warden Patrick Mirandy, Dr. Jeff Elliot "Physologist [sic]," Robert Parker, Unit Manager, stating in each: "I need to speak to you about another inmate, a [sic] emergency issue. That happen [sic] to myself on or about 12/8/11 / 12/10/11. Please call me down. Someone is here and is not suppos [sic] to be."[62] Plaintiff's supplemental response, to which copies of two of the Interview Requests were attached, attempts to refute Warden Mirandy's response claim that "at no time" did plaintiff ever, either in person or in writing, communicate with Mirandy or Anderson about his fears regarding the presence of R.S., his keepaway, at SMCC, states

> I tried to [communicate to him] in writing . . . Cleary [sic] staes im [sic] in a [sic] emergency situation with another inmate. That is here and was addressed on paper every day I document every thing and I Have [sic] my supervizer [sic] karen, [sic] Townsend the only person that will copy all sick calls all responses that will be used in court . . . Per Ms. Keller secutary [sic] for my Unit Manager Robert Parker witch [sic] clearly shows on right side of my greivance [sic] I submitted it to mr. [sic] Parker on 9/25/13. in person [sic]. That was the only way I could get in there without a [sic] explanation. So on 10/1/13, I was told that the date [on the grievance] would be changed. Mr [sic] Parker again was off that day and ms. [sic] Keller stated that she is changing my submission date to 10/1/13 from when I originally was submitted in person myself and gave it to mr. [sic] Parker.

Dkt.# 35 at 1-2.

On September 25, 2013,[63] plaintiff filed grievance No. 13-SMCC-764-109, stating

I'm filing detailed [sic] on a matter that occured [sic] on 12/8/11. Ive [sic] told Associate Warden of Security[64] we need to speak personally He states me [sic] forgot [sic] Ive told Warden I need to speak to him about a personal issue. Ive [sic]

---

[62] Dkt.# 35-2 at 2; Dkt.# 42-1 at 1.

[63] The same day plaintiff filed his complaint, he filed a grievance over SMCC staff failing to ensure his safety from inmate R.S., alleging that he was in fear of R.S. and asking for an emergency hearing. Accordingly, Mirandy was directed to file a response to plaintiff's imminent harm allegations within seven days.

[64] Plaintiff avers that Anderson, a Captain at the time of his attack, was Associate Warden of Security before becoming the Associate Warden.

not been called down. I even asked my unit manager I need to speak to him personally [sic] He states: I'll get with him later [sic] Never did [sic] Im done trying file grievance "PRLA" [sic]  Relief sought: Exaust [sic] all remidies."

Dkt.# 42-1 at 13.

Plaintiff received a response to Grievance No. 13-SMCC-764-109 from his Unit Manager on October 3, 2013, stating "[t]his matter has been assessed and proper personnel notified."[65] On October 4, 2013, plaintiff appealed to the Warden, and on October 7, 2013, he received this response: "[y]ou had a Special Management on 10-4-13 and it was found no separation was necessary." *signed* Pat Mirandy."[66]  Plaintiff appealed to the Commissioner on October 12, 2013 but it is unclear from the record if there was a response.[67]

As noted *supra,* Mirandy's initial response to the allegations of imminent harm, filed on October 8, 2013, emphatically deny that there is any record of plaintiff ever having been sexually assaulted at SMCC at any time.  However, Mirandy's subsequent response is ambiguous on the point, because he first avers that R.S. "is  not currently housed" at SMCC, but at an outside hospital "where he has been housed for over one month,"  but "[s]hould . . . [R.S.], at any point in the future, be housed at the . . . SMCC, the staff . . . will assess plaintiff's housing situation in regard to Mr. . . . [R.S.] and utilize the correctional center's policies to maximize plaintiff's safety."[68] It begs the question, then, if there is no record of plaintiff ever being assaulted by R.S. at SMCC, why take measures to ensure plaintiff's safety from him?  Further, plaintiff specifically alleges that defendant Anderson was one of the first on the scene after the rape, was the one who determined that a sexual assault had occurred and notified the State Police.  Given all this, it seems implausible that both defendants insist that no rape ever occurred and plaintiff was not in fear of R.S.  Finally, a careful

---

[65] Dkt.# 42-1 at 13.

[66] Id.

[67] Id.

[68] Dkt.# 28-1 at 1.

review of plaintiff's administrative grievances indicates that on September 1, 2013, plaintiff filed a SMACC Health Services Request Form, stating: "Nature of Problem or Request: I was sitting on the picnic table and inmate . . . R.S. and a group were throwing rocks two hit my side its [sic] sore please see me. Doctor and nurse. *signed* Matt Triplett."[69] It seems apparent then, that R.S. did in fact return to SMCC, and was not kept away from the plaintiff, despite the defendants' claims to the contrary.

Finally, despite Mirandy and Anderson's sworn affidavits insisting that at no time before or after the complaint did plaintiff ever express apprehension over the presence of R.S. at SMCC, plaintiff's specific allegations to the contrary; report of repeated attempts to speak with them and other SMCC staff; copies of August 27, 2013 Interview Requests and the September 25, 2013 grievance raise genuine issues for trial. Anderson, *supra* at 256.

Accordingly, it appears that when liberally construed, with all inferences in plaintiff's favor, that plaintiff has stated a potentially cognizable claim against Mirandy and Anderson for failure to protect him from his keepaway, R.S.

**D. Mootness**

An earlier Offender Search of the WVDOC's website, conducted in February 2013, during the pendency of plaintiff's earlier case indicated that plaintiff had a projected release date of October 2, 2014. However, a subsequent Offender Search, conducted on August 19, 2014 did not find the plaintiff listed as in WVDOC custody. The undersigned contacted the WVDOC, and then the plaintiff's parole board, and learned that plaintiff was released from SMCC on January 15, 2014 and taken under the supervision of the parole board on January 16, 2014.[70] Accordingly, because the plaintiff has been released from jail, some of his claims for relief are now moot.

---

[69] Dkt.# 42-1 at 12.

[70] The earliest that plaintiff could be eligible for early parole discharge would be January 16, 2015, but whether he will be released then has not yet been decided.

Article III of the United States Constitution, limits the jurisdiction of the federal courts to cases or controversies. Therefore, a case becomes moot when there is no viable legal issue left to resolve. See Powell v. McCormick, 395 U.S. 486, 496 (1969). If developments occur during the course of a case which render the Court unable to grant a party the relief requested, the case must be dismissed as moot. Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-699 (3d Cir. 1996).

It is well settled that to maintain an action against public officials, a plaintiff "must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct." City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)(citing Golden v. Zwickler, 394 U.S. 103, 109-10 (1969). When a prisoner is released from prison, there is no longer a "substantial controversy" between the former inmate and prison officials "of sufficient immediacy and reality'" to warrant the issuance of either injunctive or declaratory relief. Inmates v. Owens, 561 F.2d 560, 562 (4th Cir. 1977)(quoting Golden 394 U.S. at 108); see also Scher v. Chief Postal Inspector, 973 F.2d 682, 683 (8th Cir. 1992); Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980)(*per curiam*). Accordingly, plaintiff's claims for injunctive relief in the form of an emergency hearing, medical and psychological treatment for his injuries, and his early release from WVDOC are now moot.

However, release from incarceration does not moot claims for money damages under §1983. See Mawhinney v. Henderson, 542 F.2d 1, 2 (2nd Cir. 1976); United States ex rel. Jones v. Rundle, 453 F2d 147, 150 (3rd Cir. 1971); Simmons v. Wainwright, 462 F.2d 1340, fn. 1 (5th Cir. 1972). Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990). Therefore, plaintiff's claim for Five Million Dollars in damages for future needs is not yet moot.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the defendants' Supplemental Motion to Dismiss (Dkt.# 43) be **DENIED IN PART** as to defendants Mirandy and Anderson and **GRANTED IN PART** as to defendant Rubenstein, that defendant Rubenstein be **DISMISSED** from this action, and that a scheduling Order be entered.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by September 2, 2014**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to transmit a copy of this Report and Recommendation to all counsel of record electronically, as applicable.

DATED: September 2, 2014

/s/ James E. Seibert _____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE